**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

BRIAN LEE HUNT,

                         Petitioner,

    v.                                      9:22-CV-171
                                          (DNH/DJS)

STEWART ECKERT, Superintendent of Wende
Correctional Facility,

                         Respondent.

**APPEARANCES:**                        **OF COUNSEL:**

BRIAN LEE HUNT
Petitioner, pro se
96-B-0328
Wende Correctional Facility
P.O. Box 1187
Alden, NY 14004

HON. LETITIA JAMES               HANNAH S. LONG, ESQ.
Attorney for Respondent           Assistant Attorney General
Attorney General of New York
28 Liberty Street
New York, New York 10005

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

### I.     INTRODUCTION

This matter has been referred for a report and recommendation by the Hon. David N.

Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

72.3(c). Petitioner Brian L. Hunt seeks federal habeas corpus relief pursuant to 28 U.S.C.

§ 2254. Dkt. No. 1, Petition ("Pet."); Dkt. No. 1-1, Supporting Exhibits. Respondent opposed the petition, and, with the Court's permission, filed a limited answer addressing only the issue of timeliness. Dkt. No. 18, Limited Answer; Dkt. No. 18-1–18-3, State Records; Dkt. No. 18-4, Memorandum of Law in Opposition to Petition ("Memo."). Petitioner replied, raising an actual innocence claim for the first time. Dkt. 20, Traverse ("Trav."); Dkt. No. 20-1–20-2, Supporting Exhibits; Dkt. No. 21, Fingerprint Report; Dkt. No. 34, DNA Report. With the Court's permission, Dkt. No. 23, respondent filed another memorandum, addressing petitioner's actual innocence claims. Dkt. No. 39, Sur-Reply Memorandum of Law in Opposition to Petition ("Sur-Reply"); Dkt. No. 40, Long Declaration ("Long Decl."); Dkt. No.40-1–40-11, Supporting Exhibits. Petitioner replied. Dkt. No. 41, Reply to Sur-Reply ("Reply").[1]

For the reasons which follow, it is recommended that the petition be dismissed as untimely.

## II.    RELEVANT BACKGROUND

### A. Conviction

On December 23, 1987, petitioner and an accomplice burglarized a home in Syracuse, New York. Dkt. No. 40-3 at 46. When the home's resident, Margaret Murray, returned home unexpectedly during the burglary, petitioner and accomplice killed Ms. Murray. *Id.* at 45, 144-49. After an extensive investigation by the Syracuse Police Department, an Onondaga County Court grand jury indicted petitioner in September 1988

---

[1] For the sake of clarity, citations to parties' submissions refer to the pagination generated by CM/ECF, the Court's electronic filing system.

on two counts of murder, three counts of burglary, and one count of criminal possession of a weapon.  Dkt. No. 18-1 at 15-16.  In July of 1989, an Onondaga County jury failed to reach a verdict, deadlocking eight to four in favor of petitioner's acquittal.  Dkt. No. 40-2 at 380-81; Dkt. No. 20-2 at 69.

In January 1990, petitioner was again tried before another Onondaga County Court jury.  Dkt. No. 18-1 at 74-77.  This time the jury returned a guilty verdict on four counts[2], convicting petitioner of two counts of second-degree murder, two counts of first-degree burglary, and one count of fourth-degree criminal possession of a weapon.  Dkt. No. 40-7 at 135-136.  On February 8, 1990, the Onondaga County Court sentenced petitioner to an aggregate term of 33 1/3 years to life to run consecutively with an Illinois sentence petitioner was already serving.[3]  Dkt. No. 18-1 at 79-90.

## B.  Direct Appeal

Petitioner appealed his conviction to the New York State Appellate Division, Fourth Department ("Fourth Department").  Dkt. No. 18-1 at 101-19.  Petitioner argued that: (i) the prosecutor's closing argument improperly included statements not previously

---

[2]  The third burglary charge was dropped prior to trial.  Memo. at 7; Dkt. No. 18-1 at 16.

[3]  A discrepancy exists between the court minute extracts and the sentencing hearing transcript as to the details of petitioner's sentence. The court minutes extracts, prepared within a day of sentencing, indicate that the Onondaga County Court imposed a term of (i) 25 years to life on each count of murder running concurrently to each other; (ii) 8 1/3 years to 25 years on three counts of burglary, with those sentences running concurrently to each other and consecutively to both murder sentences; and (iii) 1 year on the one count of criminal possession of a weapon running concurrently with the murder and burglary sentences.  Dkt. No. 18-1 at 92-96.  The transcript from the sentencing hearing, prepared four months later, shows the Onondaga County Court only sentenced petitioner on one count of murder and two counts of burglary, contradicting the extracts prepared immediately following the sentencing.  *Id.* at 89.  The discrepancies, which ultimately had no effect on the aggregate term petitioner faced, were addressed by the New York State Appellate Division on petitioner's direct appeal, discussed below.

admitted to evidence; and (ii) the consecutive nature of the burglary and murder sentences violated state law. *Id.* at 110-18.

On June 7, 1991, the Fourth Department rejected petitioner's first point but partially agreed with petitioner's second argument. Dkt. No. 18-1 at 175-76. The Fourth Department implicitly modified the Onondaga County Court's sentence, recognizing that petitioner received two terms of imprisonment of 25 years to life for both his felony and intentional murder convictions. *Id.* at 176. The Fourth Department then found, in agreement with petitioner's second argument, that the burglary convictions and the felony murder conviction arose out of the "same act[,]" and, therefore, must run concurrently to each other. *Id.* But the Fourth Department continued, stating that the burglary convictions and the intentional murder convictions "arose out of separate acts" as the "burglaries were complete when [petitioner] entered the home" and the intentional murder was not committed until "after the victim unexpectedly returned home[.]" *Id.* As such, the Fourth Department concluded the trial court properly imposed the intentional murder sentence to run consecutively to the burglaries. *Id.* Thus, the Fourth Department's modified sentence imposed a term of (i) 25 years to life on each count of murder running concurrently to each other; (ii) 8 1/3 years to 25 years on two[4] counts of burglary running concurrently to each other, concurrently to the felony murder conviction, and consecutively to the intentional murder conviction; and (iii) 1 year on one count of

---

[4] The Fourth Department's decision never resolved the discrepancy of whether petitioner was convicted of two or three counts of burglary, but respondent conceded that petitioner was in fact convicted of only two counts of burglary. Memo. at 8. The trial court's error does not impact petitioner's aggregate sentence or any of the issues at hand.

criminal possession of a weapon to run concurrently with the other sentences. With its modifications, the Fourth Department affirmed petitioner's conviction.[5]

Petitioner did not appeal the Fourth Department's decision to the New York State Court of Appeals.

### C. Collateral Appeals

In 2018, petitioner filed a motion in Onondaga County Court to set aside his sentence pursuant to New York State Criminal Procedure Law ("C.P.L.") § 440.20. Dkt. No. 18-1 at 177-78. Petitioner challenged *inter alia* the legality of his sentence under New York's 2017 Raise the Age Act which raised the age juvenile offenders could be prosecuted as adults. *Id.* at 180-97. On July 10, 2018, the Onondaga County Court dismissed the § 440.20 motion, noting that the Raise the Age Act did not apply retroactively nor "would . . . [it] apply to the facts at bar, given the [petitioner's] use of a knife [in the commission of the crimes]." *Id.* at 229.

In July 2018, petitioner filed a notice seeking leave to appeal the lower court's decision with the Fourth Department. Dkt. No. 18-1 at 244-251. The Fourth Department denied leave in January 2019. *Id.* at 254. Petitioner then sought leave to appeal to the New York State Court of Appeals. *Id.* at 256-61. The Court of Appeals denied petitioner's appeal on February 28, 2019. *Id.* at 268.[6]

---

[5] The Fourth Department's modifications to the sentence ultimately had no effect on the aggregate length of the sentence. Petitioner still faced an aggregate of 33 1/3 years to life.

[6] Petitioner also unsuccessfully applied for reconsideration of the Fourth Department's decision denying petitioner leave to appeal, Dkt. No. 18-1 at 269-70; consequently, the New York State Court of Appeals denied petitioner's motion on April 10, 2019, *id.* at 271.

In January 2020, petitioner filed a second § 440.20 motion with the Onondaga County Court, raising similar arguments as his first § 440.20 motion. Dkt. No. 18-1 at 272-88. On January 15, 2020, the County Court again rejected petitioner's motion. *Id.* at 291-92. The Fourth Department denied leave to appeal on March 12, 2020. *Id.* at 299.

Petitioner then filed a New York State CPLR Article 78 motion in June 2020, challenging the calculation of his sentence in the Supreme Court, Albany Court. Dkt. No. 18-2 at 30-51. The Supreme Court, Albany County denied the petition, noting that DOCCS accurately calculated petitioner's sentenced based on the "specific language of the commitment order[,]" and that DOCCS' calculations "were not affected by an error of law." *Id.* at 23-25.

Petitioner appealed to the New York State Appellate Division, Third Department ("Third Department"). Dkt. No. 18-2 at 4. On January 6, 2022, the Third Department affirmed the Supreme Court's decision, noting again that "DOCCS is conclusively bound by the contents of the commitment papers that accompanied petitioner[.]" *Id.* at 96-98. Petitioner filed for leave to appeal to the Court of Appeals. *Id.* at 99-107. On May 19, 2022, the Court of Appeals denied leave. *Id.* at 131.

In March 2021, petitioner filed a motion for reconsideration with the Fourth Department, asking the court to review its 1991 decision to dismiss petitioner's direct appeal. Dkt. No. 18-2 at 133-38. As in his direct appeal, petitioner argued that the Fourth Department's modification of the trial court's sentence violated state law. *Id.* at 137. On June 11, 2021, the Fourth Department dismissed petitioner's motion as untimely. *Id.* at 165.

Petitioner filed a third § 440.20 motion in April 2021 with the Onondaga County Court on similar grounds to his previous two § 440.20 motions. Dkt. No. 18-3 at 28. Again, the County Court denied petitioner's motion. *Id.* at 70-71. Petitioner sought leave to appeal. *Id.* at 76. Again, the Fourth Department denied leave. *Id.* at 87.

Following the flurry of state court litigation, petitioner filed the instant petition in the United States District Court for the Western District of New York on February 16, 2022. Pet. at 1. Pursuant to 28 U.S.C. § 2241(d) and 28 U.S.C. § 1406(a), the Western District of New York transferred the petition to the Northern District of New York. Dkt. No. 3 at 1-2.

## III. PETITION

Petitioner challenges his 1990 conviction, resulting from a jury trial in Onondaga County, and subsequent sentence for second degree murder, first degree burglary, and fourth degree criminal possession of a weapon. Pet. at 1. Petitioner contends that he is entitled to federal habeas corpus relief because: (1) his consecutive sentences for intentional murder and burglary violate the Fifth Amendment Double Jeopardy Clause incorporated by the Fourteenth Amendment Due Process Clause ("Count I"); (2) the Fourth Department's revised sentence is ambiguous in violation of the Fourteenth Amendment due process clause ("Count II"); (3) the Fourth Department based petitioner's revised sentence on inaccurate commitment papers that incorrectly stated his sentence, violating his Fourteenth Amendment due process rights ("Count III"); (4) DOCCS miscalculated his sentence violating the Fourteenth Amendment due process

clause ("Count IV"); and (5) his sentence violates the Eighth Amendment Cruel and Unusual Punishment Clause ("Count V").  *Id.* at 6-7, 10-13.[7]

Respondent opposes the petition, arguing that it should be dismissed as time barred.  Memo. at 17.

## IV.    DISCUSSION

### A.  Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for prisoners to seek federal habeas corpus review of state criminal convictions.  28 U.S.C. § 2244(d)(1).  The one-year period begins on the latest of:

a) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

b) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

c) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

d) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

§ 2244(d)(1)(A)-(D).

---

[7] Petitioner also asserts numerous state law claims.  Pet. at 6-7.  Under 28 U.S.C. § 2254(a), this Court may only "entertain an application for a writ of habeas corpus . . . on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  § 2254(a); *see also Thomas v. Larkin,* 2013 WL 5963133, at *13 (E.D.N.Y. Nov. 7, 2013) ("[F]ederal courts may not issue the writ [of habeas corpus] on the basis of a perceived error of state law[.]").  Accordingly, even if the instant action were timely filed, the Court cannot address petitioner's state law claims.

If the latest of the four dates occurred prior to AEDPA's enactment, the limitations period begins to run "from the AEDPA's effective date: April 24, 1996." *Wood v. Milyard*, 566 U.S. 463, 468 (2012).

### 1. Counts I, II, & III

For Counts I, II, and III, the limitations period begins on the date on which petitioner's state criminal conviction became final. § 2244(d)(1)(A). A criminal conviction is "final" upon "the conclusion of direct review [of the conviction] or the expiration of the time for seeking such review[.]" *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012) (internal quotation marks omitted). Here, the Fourth Department denied petitioner's direct appeal on June 12, 1991. Dkt. No. 18-1 at 173. Petitioner had until July 12, 1991 to seek leave to appeal to the Court of Appeals. C.P.L. § 460.10(5)(a). Petitioner failed to do so; therefore, his conviction became final July 12, 1991.

As AEDPA was not yet enacted, petitioner's limitation period did not begin to run in 1991. Instead, petitioner's limitation period began to run on April 24, 1996, AEDPA's effective date. *See Wood*, 566 U.S. at 468. Petitioner had one year from that date, or until April 24, 1997, to timely file a habeas petition seeking relief for his first three claims/causes of action.

Petitioner filed the instant petition on February 16, 2022, nearly 25 years late. As such, unless petitioner can prove his claims are entitled to tolling, Counts I, II, and III are untimely.

### 2.  Count IV

For Count IV, the limitations period begins on the date on which the factual predicate of Count IV could have been discovered with due diligence. § 2244(d)(1)(D). Count IV challenges DOCCS' calculation of petitioner's sentence, making the relevant factual predicate the calculation of his sentence.   Pet. at 12.   DOCCS calculated petitioner's sentence in February 1996 when DOCCS received petitioner in custody.  Dkt. No. 18-3 at 96.  It is unclear if petitioner immediately knew of his sentence calculation at that time; however, it is clear that petitioner knew the factual predicate for his challenge to his sentencing calculation by June 17, 1997, when petitioner wrote DOCCS a letter acknowledging his 2029 parole eligibility date.  Dkt. No. 18-3 at 104.  Thus, at the latest, the AEDPA limitations period began running on June 17, 1997 – the day petitioner knew of the factual predicate of Count IV.  Petitioner had one year from that date, or until June 17, 1998, to timely file his habeas petition. § 2244(d)(1).

Petitioner filed the instant petition on February 16, 2022, over 23 years late.  As such, unless petitioner can prove his fourth claim is entitled to a tolling, it too is untimely.

### 3.  Count V

For Count V, petitioner relies on the Supreme Court decision in *Miller v. Alabama*, 567 U.S. 460 (2012).  Pet. at 7; Dkt. No. 1-1 at 50-52, 55-65. Thus, the limitations period for Count V began on June 25, 2012, the date the Supreme Court decided *Miller*.  *See* § 2244(d)(1)(C); *Miller v. Alabama*, 567 U.S. at 465.  Petitioner had one year from that date, or until June 25, 2013, to timely file a habeas petition based on the *Miller* decision.

Petitioner filed the instant petition on February 16, 2022, over 8 years late. As such, unless petitioner can prove tolling applies, his final claim is also untimely.

### B. Tolling

#### 1. Statutory Tolling

The one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *Saunders v. Senkowski*, 587 F.3d 543, 548 (2d Cir. 2009). State court relief filed during or after the limitations period expired "does not reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.3d 13, 16-17 (2d Cir. 2000) (per curiam).

Here, petitioner never sought collateral or other post-conviction relief until 2018 – well after the AEDPA limitations periods expired for all five counts. Nor do petitioner's numerous state petitions filed since 2018 reset the expired limitations period. *See Smith v. McGinnis v. McGinnis*, 208 F.3d at 17 (finding that filing post-conviction petitions do not "reset the date from which the" statute of limitations begins to run). As such, petitioner is not entitled to statutory tolling.

#### 2. Equitable Tolling

Equitable tolling applies only in "rare and exceptional" circumstances. *Smith v. McGinnis*, 208 F.3d at 17. "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (citation omitted); *see also Smith v. McGinnis*, 208 F.3d at 17.

Here, petitioner never argues he is entitled to equitable tolling, nor does the Court discern anything in the record to suggest petitioner is entitled to equitable tolling.

### 3. Equitable Exception

Courts have also recognized an equitable exception to the one-year statute of limitations under §2244(d)(1) in cases where a petitioner can prove their actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). However, "[o]nce guilt is . . . established . . . a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence. . . . Rather, a federal habeas court will review state convictions for constitutional error." *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019).

A federal court will only recognize an equitable exception in a "narrow class of truly extraordinary cases . . . [where a petitioner can] present[] credible and compelling claims of actual innocence." *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 338 (1995)) (internal quotation marks omitted). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. at 324; *see also Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012). A "petitioner does not meet the threshold requirement [of actual innocence] unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. at 386.

"The standard's demand for evidence *of innocence*[] references factual innocence, not mere legal insufficiency[.]"  *Hyman v. Brown*, 927 F.3d at 657 (internal quotation marks and citations omitted).  In clarifying what this standard requires, the Second Circuit explained:

> a reviewing court assessing the probability of actual innocence is not limited to the trial record.  To the contrary, it "must consider all the evidence, old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. at 538 . . . (internal quotation marks omitted), and, in doing so, "is not bound by the rules of admissibility that would govern at trial," *Schlup v. Delo*, 513 U.S. at 327 . . . . This is because, at the gateway stage of inquiry, a habeas court's task is not to identify trial error or to delineate the legal parameters of a possible new trial.  It is to identify those cases in which a compelling showing of actual innocence would make it a manifest injustice to maintain conviction unless it was free of constitutional error.  Thus, incriminating evidence obtained in the course of an unlawful search, or custodial admissions made in the absence of *Miranda* warnings, may well be inadmissible at trial.  Nevertheless, such evidence is properly considered in assessing factual innocence, with the manner of procurement informing reliability and relevance and, therefore, weight.

*Id.* at 658.

Here, petitioner cannot meet this high burden.

Petitioner's conviction rests on little physical evidence.  Instead, to convict petitioner, the jury relied on the testimony of petitioner's accomplice, the testimony of a corroborator, and petitioner's confessions to his brother and sister-in-law – all of which implicated petitioner in the slaying.  While the specifics are subsequently discussed in greater detail, in sum, the credibility of both petitioner's accomplice, Pamela Chase, and corroborator, Philip Whaley, was heavily contested at trial.  In finding the petitioner guilty, the jury indicated that it found the testimony of Chase and Whaley credible.

To prove his actual innocence, petitioner provides several new pieces of evidence, the bulk of which focuses on attacking Whaley's credibility. Specifically, petitioner presents several letters challenging the veracity of Whaley's testimony at trial. Trav. at 59-81. Petitioner also provides new physical evidence, Dkt. No. 21 at 1-3; Dkt. No. 34 at 1-5; Dkt. No. 40-8 at 35, and new evidence that impeaches the medical examiner who testified at trial, Trav. at 7-10. However, as discussed below, none of petitioner's new evidence challenges the jury's basis for conviction or unequivocally proves petitioner's actual innocence. As such, the Court cannot find petitioner actually innocent.

### i. New Whaley Evidence

Petitioner provides new letters Whaley sent in 1988 and 1989 to the prosecutor and detective working petitioner's case. Trav. at 59-81. Petitioner argues these letters show Whaley lied during his testimony, and, thus, prove petitioner's actual innocence.[8] *Id.* at 5-6.

Once an initial factfinder has weighed a witness' credibility, it is not the place of a federal court to disturb that conclusion during habeas review. *See Love v. Martuscello*, 2022 WL 2109244, at *4, *8 (W.D.N.Y. June 10, 2022) (denying petitioner's argument that the factfinder "should have weighed the credibility of the witnesses differently and drawn alternate inferences from the proof," because "[n]either [courts] on direct appeal

---

[8]  Petitioner further argues that if Whaley's testimony cannot be trusted then, under C.P.L. § 60.22's accomplice corroboration rule, Chase's testimony is not enough to convict him. Trav. at 6. Petitioner concludes that on this basis his conviction should be overturned. *Id.* First, as previously articulated supra n. 7, Petitioner would not be entitled to relief on state law claims. Second, even if it did, Chase's testimony was corroborated by several other pieces of evidence, including Susan Hunt's testimony that petitioner confessed to the murder. Dkt. No. 40-5 at 74-76.

nor . . . federal habeas [courts are] . . . permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity.") (internal quotation marks and citations omitted).  In fact, "the Supreme Court has stated that newly discovered impeachment evidence is a step removed from evidence pertaining to the crime itself and tends only to impeach the credibility of the witness[,]" instead of demonstrating actual innocence. *Jones v. Annucci*, 124 F. Supp. 3d 103, 124 (N.D.N.Y. 2015) (citing *Calderon v. Thompson*, 523 U.S. 538, 563 (1998)) (internal quotation marks omitted); *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) (holding that new impeachment evidence "will seldom, if ever" be enough to establish actual innocence).

Here, the new letters petitioner provides do successfully attack Whaley's credibility.  The new letters demonstrate that Whaley expected assistance from the prosecutor on charges then pending against Whaley in exchange for his testimony against petitioner.  Trav. at 61-62, 69-70.  However, at petitioner's second trial, Whaley was thoroughly impeached.  Whaley already admitted, during cross-examination, that he only testified against petitioner because he sought help from the prosecution for felony charges he faced at the time.  Dkt. No. 40-5 at 51-60.  Further, during cross-examination, Whaley admitted that he had been convicted of felony possession of stolen property in 1971, obstruction of governmental administration in 1973, felony attempted assault in 1981 involving a sexual attack on a 12-year-old girl, and felony criminal possession of a weapon in 1985.  Dkt. No. 40-5 at 5-10.  Whaley also admitted to lying at petitioner's grand jury, *id.* at 66, and stealing and selling a shotgun from his boss, *id.* at 39-40.

Thus, the new letters simply reinforce what the jury already knew: that Whaley was not an unbiased witness. Despite such knowledge, the jury still chose to believe Whaley and convict petitioner. It is not the place of a federal habeas court to revisit the jury's judgment of Whaley's credibility, especially when the new evidence only reiterates what the jury already knew. Further, nothing in the letters proves petitioner's actual innocence. With only redundant impeachment evidence and no evidence of petitioner's actual innocence, the new letters fail to convince the Court that "no juror, acting reasonably, would have voted to find [petitioner] guilty[.]" *McQuiggin*, 569 U.S. at 386.

### ii.    Physical Evidence

Petitioner next presents three new pieces of physical evidence: (1) a DNA testing report from Onondaga County's forensic laboratory, Dkt. No. 34 at 3-6; (2) a fingerprint testing report from Onondaga County's forensic laboratory, Dkt. No. 21 at 2-3; and (3) a gas station receipt, Dkt. 40-8 at 35. Petitioner argues that each piece of physical evidence proves his innocence. Trav. at 7; Dkt. No. 34 at 1; Dkt. No. 21 at 1. The Court disagrees on all three counts.

### a. DNA Testing

The DNA test from Onondaga County's Center for Forensic Sciences ("CFS") tested multiple objects from the scene of the crime and various samples from the victim's autopsy. Long Decl. at ¶ 10. From the objects tested, CFS obtained workable DNA results from: (1) a group of figurines found in the victim's home; (2) a small Quikut-brand knife; and (3) the victim's left-hand fingernail clippings. Dkt. No. 34 at 3-4.

The DNA results from the above objects are suitable for manual comparison[9], and petitioner requests his DNA be manually compared with all three objects.  Dkt. No. 34 at 1.  Petitioner argues that the comparisons will prove his DNA is absent from each object; therefore, the lack of DNA demonstrates petitioner's actual innocence.  Dkt. No. 34 at 1.

However, there is also no evidence that a comparison of any of the three objects to petitioner's DNA would render valuable conclusions.  Therefore, the Court rejects petitioner's argument and denies petitioner's request.

First, the record suggests that the figurines recovered played no role in the murder.  Testimony places the figurines in a cabinet in the victim's dining room during the murder.  Dkt. No. 40-3 at 142.  There is no other evidence that petitioner touched the cabinet or the figurines inside; petitioner was not attempting to steal the figurines and they were not used as a weapon in either the attack of, or in defense by, the victim.  Accordingly, the absence of petitioner's DNA on the figurines holds little relevance or probative value in determining his innocence.  The only conclusion that could be drawn by the absence of petitioner's DNA on the figurines is that petitioner did not touch the figurines – a fact that cannot prove petitioner's actual innocence.

There is also no evidence that petitioner used the Quikut-knife during the burglary or murder.  Four knives were mentioned during the trial as a possible weapon involved in the murder: (1) a large sheathed knife not recovered by police, Dkt. No. 40-5 at 76, 147;

---

[9]  None of the results are high quality enough to be entered into the FBI's CODIS database, severely limiting the usefulness of the results.  Dkt. No. 34 at 4; Long Decl. at ¶ 11.  Further, Chase and Whaley have passed away, in 2018 and 2019 respectfully, making a manual comparison of the DNA results to either witness prohibitively difficult if not impossible.  Sur-Reply at 22.

(2) a large sheathed hunting knife also not recovered by police, *id.* at 160-61; Dkt. No. 40-8 at 91; (3) the serrated steak knife recovered at a nearby park, Dkt. No. 40-8 at 54; and (4) the Mississippi Gambler dagger recovered on petitioner when police arrested him, *id.* at 53.  The police recovered the Quikut-knife at the victim's home but neither the police nor Chase tied the knife to the murder.  Nor is there any chance the Quikut-knife is one of the two unrecovered knives.  The Quikut-knife is small and has no sheath, Dkt. 40-10 at 18, which does not match the description of the two knives not recovered by the police.  Consequently, even though the victim was stabbed to death, there is no evidence that ties the Quikut-knife to the commission of the crime.  Therefore, the potential absence of petitioner's DNA on the knife holds little relevance or probative value in determining his innocence.  Again, the only conclusion that could be drawn by the absence of petitioner's DNA on the Quikut-knife is that petitioner did not touch the knife.  However, because this was not the knife that was used in the commission of the murder, that particular fact does not prove petitioner's actual innocence.

Lastly, a DNA comparison of petitioner to the DNA under the victim's fingernails also holds no probative value as the DNA under the victim's fingernails comes from a female.  Dkt. No. 34 at 3.

Petitioner also contends that comparing the female DNA recovered under the victim's fingernails to Chase's DNA could impeach Chase, thus "exonerating" petitioner. Dkt. No. 34 at 1.  Specifically, petitioner argues that if the female DNA under the victim's fingernails matched Chase's DNA, it will impeach Chase as she did not testify to touching or being touched by the victim.  *Id.*  However, petitioner's argument is based on an

inaccurate recollection of the record. Chase testified that the victim grabbed her and, despite Chase slapping at the victim's hands and pulling away from the victim, Chase could not loosen the victim's grip until petitioner pulled her away. Dkt. No. 40-3 at 146-47. Despite petitioner's argument to the contrary, Chase's DNA being under the victim's fingernails is consistent with Chase's testimony and does nothing to impeach Chase.

### b. Fingerprint Testing

The fingerprint test from Onondaga County's Center for Forensic Sciences ("CFS") tested multiple objects from the scene of the crime. Dkt. No. 21 at 2. From the objects tested, CFS obtained workable fingerprint results from only a red tray. *Id.* Petitioner's fingerprints were compared to five fingerprints lifted from the red tray. *Id.* at 3. The five comparisons provided one inconclusive result and the other four did not match petitioner's fingerprints. *Id.* at 3.

Petitioner argues that the lack of a fingerprint match proves his actual innocence. Dkt. No. 21 at 1. The Court disagrees. Nothing in the record suggests the red tray was involved in the burglary or murder. As petitioner is not alleged to have handled the red tray during the break-in or as a weapon in the subsequent attack, the absence of petitioner's fingerprints on the red tray is unsurprising. The only conclusion that can be drawn from the absence of petitioner's fingerprints on the red tray is that petitioner did not touch the red tray – a fact that holds little probative value in determining petitioner's actual innocence since the victim was stabbed to death. Thus, the Court denies petitioner's argument.

### c.  Gas Station Receipt

Petitioner's last piece of new physical evidence is a receipt that petitioner alleges is for the Mississippi Gambler knife.  Trav. at 7.  Chase identified the Mississippi Gambler knife as the murder weapon at trial.  Dkt. No. 40-4 at 10; Dkt. No. 40-8 at 53.  Petitioner argues that the receipt shows the Mississippi Gambler knife was bought in New Mexico five months after the murder and could not be the murder weapon, thus proving his actual innocence.  Trav. at 7.

The Court disagrees.  A photocopy of the receipt used in petitioner's first trial[10] identifies the store, location, time, and dollar amount of the purchase but does not name the purchaser or, more importantly, the item purchased.  Dkt. No. 40-8 at 53.  Without identifying the purchaser or the item purchased, the receipt provides no relevant evidence to petitioner's actual innocence claim.

Considering the extremely limited probative value of the DNA and fingerprint reports and the gas station receipt, the Court cannot find that "no juror, acting reasonably, would have voted to find [petitioner] guilty."  *McQuiggin*, 569 U.S. at 386.

### iii.    Medical Examiner

Petitioner also presents new evidence that impeaches the former Onondaga County Medical Examiner, Erik Mitchell, who testified for the prosecution at petitioner's trial.  Trav. at 7-10.  Petitioner's new evidence shows that Mitchell committed multiple acts of professional misconduct during the time of petitioner's two trials.  Trav. at 7-10; *see Rivas*

---

[10]  Considering petitioner's counsel used the receipt at the first trial there is an argument the receipt is not new for the purpose of the actual innocence standard.  Respondent does not raise the argument, and therefore, the court accepts the receipt as "new" and will consider it on its merits.

*v. Fischer*, 687 F.3d 514, 521 (2d Cir. 2012) (finding Mitchell committed many acts of misconduct dating from 1989 to 1993).    Petitioner argues that evidence of such misconduct at his trial would discredit Mitchell's testimony for any reasonable juror, and, therefore, call into question on Mitchell's testimony that the Mississippi Gambler knife was the murder weapon.  Trav. at 8.

At trial, Mitchell testified that some of the stab wounds the victim suffered were consistent with the Mississippi Gambler knife, bolstering Chase's testimony that the Mississippi Gambler knife was the murder weapon.  Dkt. No. 40-6 at 16.  Petitioner's medical expert disputed that the Mississippi Gambler knife caused some of the wounds that Mitchell attributed to the Mississippi Gambler knife but ultimately concluded that the knife could have caused some of the wounds on Ms. Murray's body.  *Id.* at 192-93, 203.

Even with this new impeachment evidence, the jury still heard from petitioner's own medical expert who agreed that Mitchell was correct in assessing that the Mississippi Gambler knife could have caused some of the wounds on the victim's body, Dkt. No. 40-6 at 203.   Thus, the Court cannot find how Mitchell's impeachment adds any probative value to petitioner's actual innocence discussion.

Further, Mitchell's impeachment evidence does not provide any evidence of petitioner's actual innocence.  It simply calls into question Mitchell's credibility and conclusions at trial, many of which were already challenged at trial by petitioner's medical examiner.  As noted above, "the Supreme Court has stated that newly discovered impeachment evidence is a step removed from evidence pertaining to the crime itself and

tends only to impeach the credibility of the witness," instead of demonstrating actual innocence. *Jones v. Annucci*, 124 F. Supp. 3d at 124 (citing *Calderon v. Thompson*, 523 U.S. 538, 563 (1998)) (internal quotation marks omitted).  Thus, the Court finds petitioner's new evidence impeaching Mitchell fails to establish petitioner's actual innocence.

In conclusion, having reviewed all the new evidence, in conjunction with the evidence already available, the Court denies petitioner's actual innocence claim.  The Court cannot say that "the [new] evidence is so compelling and unequivocal that no reasonable juror would have convicted [petitioner.]".  *Wilson v.* Cromwell, 69 F. 4th 410, 422 (7th Cir. 2023).  The new evidence adds only at the margins of petitioner's defense and the Court will not disturb a jury's judgment based on so little.  Thus, petitioner failed to establish an equitable exception to the AEDPA's limitations period, and therefore, the petition should be dismissed as untimely.

## V.    CONCLUSION

**WHEREFORE**, it is

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED AND DISMISSED** in its entirety; and it is further

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[11] and it is further

---

[11]  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show

**RECOMMENDED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk of the Court respectfully provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

**IT IS SO ORDERED.**

Date:  August 20, 2024
       Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

---

that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).